Gaston, J.
 

 At April Term, 1S41, of the Superior Court of Equity for the county of Beaufort, a petition was filed by Thomas J. Latham, the guardian of Daniel Latham, a lunatic, setting forth that the said Daniel, before he had become of unsound mind, had contracted debts to so large an amount, that it would require all his estate to satisfy the just demands of his creditors, and that, if the said estate be permitted to be seized on executions and sold under them, it will be sold for much less than it is worth, and a large part of it will be dissipated in the payment of costs ; further setting forth particularly all the articles of personal property, and the different parcels of real property constituting the estate of the said lunatic, and shewing that the said lunatic hath a wife and four infant children, who are utterly destitute of the means of support except as they may be furnished from the said estate, and praying that the court will be pleased to order a sale to be made of all the said property by some fit person to be appointed by the court, on such terms as the court may designate, and that the moneys raised by such sales be applied and secured to such trusts, and for such purposes, as the court in its judgment may direct. Thereupon, the court, at the same term, was pleased to make an order, that all the property of the said lunatic, except two chargeable female slaves, with respect to the support of whom a special provision was made, be sold by the petitioner, Thomas J. Latham, after giving twenty days notice, on a credit of six months, taking bonds with good security for the sales thereof from the purchasers, and that he bring in the same at the next court. At the October Term, 1841, Thomas J. Latham, the guardian, made a report of his sales under this order, when, objections being taken
 
 *296
 
 ^iereto ky Howard Wiswall, the defendant, as one of the creditors of the lunatic, and others, the court was pleased to set aside the sales so made, and to order that the Clerk and Master of the court do, between this and the succeeding’ term, carry into effect the previous order for a sale pursuant to the terms of said order, and make report to the next term. At the April Term, 1842, Thomas J. Latham, as guardian to the said lunatic, filed this bill, wherein he set forth the proceedings aforesaid upon the said petition, and that the Clerk and Master had executed the order as directed by the court, and was ready to make report of his sales, but he charged that the said Wiswall had, under an execution against the goods and chattels, lands and tenements of the lunatic, purchased at sheriff’s sale, since the preceding term of the court, one of the tracts of land so ordered to be sold, and, having taken a conveyance
 
 from the
 
 sheiiff, had instituted an action of ejectment against the said lunatic for the purpose of recovering the possession thereof, which action had been instituted in contempt of the said court, and of the order of sale made therein as aforesaid. And tbe bill prayed for an injunction to restrain the defendant from the further prosecution o-f the said suit, and for general relief.
 

 The defendant put in his answer, wherein, after admitting the proceedings upon the petition as set forth in the bill, he stated that William Cook, suing to the use of the defendant, instituted an action against Daniel Latham, the lunatic, by writ returnable to the May Term, 1841, of I-Jyde County Court, and at the August Term thereafter, recovered a judgment therein for a large sum'of money; that execution issued on said judgment, returnable to tbe November Terra following of the said court, directed to the sheriff of Beaufort county, which was levied on the tract of land in question, and the said execution with the levy indorsed thereon was returned to the County Court of Hyde, but no further process had issued thereon, because the said tract was sold as thereinafter set forth. The defendant further stated, that one Thomas B. Winfield instituted a suit against the said lunatic, by writ returnable to the June Term, 1841, of Beaufort County Court, and at the said term, recovered a judg
 
 *297
 
 ment for a large amount, upon which judgment a
 
 fieri facias
 
 issued, and was returned by the sheriff of said county to the September Term of said court,- levied.on the said traet of land. He further set forth, that from the September Term aforesaid, there issued a
 
 venditioni exponas
 
 to the said sheriff, commanding him to expose the said land for sale to the highest bidder,-in pursuance of which,- the sheriff'sold the same on- the Friday before the first Monday of December, 1841, and the defendant became the purchaser thereof at the price of $205, and on the 24th of February following, the sheriff executed a deed to the defendant therefor. The defendant averred that the debts, wherever the said judgments were rendered, were just debts, and the said judgments were duly and fairly obtained ; admitted that at the October Term, 1841, of the Beaufort Coart of Equity, he did, as a creditor of the lunatic, being the beneficial owner of the judgment rendered in favor of Cook, apply to the court to set aside the sale of the' lands made by the plaintiff as stated in his bill, because the said' guardian was in truth, though notin form1, the purchaser at the said sale; but insisted, nevertheless, that, as neither he nor Wingfield was party to the proceedings on' the petition, no order therein made could affect their rights, and that therefore he was in no contempt for purchasing the said land under the said Wingfield’s execution, or for prosecuting his action of ejectment to recover the possession thereof, the title to which he had rightfully acquired under his said' purchase and conveyance from the sheriff. Upon the coming in of this answer, a motion was made to dissolve the injunction, which had been granted on the filing of the bill. This motion was refused, and from the interlocutory order disallowing the same, the defendant was permitted to appeal to this court.
 

 In every civilized community, the State is bound to take cave of those, who, by reason of their imbecility and want of understanding, are unable to take care of themselves. In England, the country from which we have derived most of ‘ our legal institutions, the'care of idiots and lunatics was devolved upon the Ring, as one of his prerogatives, and also as
 
 *298
 
 a duty he owed to his subjects in return for their obedience and fidelity. How far, or in what manner, this royal office vvas exercised at common law, or whether it was first specially declared by act of Parliament, it may not be easy now to determine, but it was certainly recognized and regulated at least as far back as the reign of Edward the second. By the statutes, 17 Edw. 2, Ch. 9, and Ch. 10, it was ordained, “that the King shall have the custody of the lands of natural fools, taking the profits of them without waste or destruction, and shall find them their necessaries, of whose fee soever the lands be holden, and after the death of such idiots, he shall render them to the right heirs, so that such idiots shall not aliene nor their heirs be disinherited.” And, “ also the King shall provide, when any, that before-time hath had his wit and memory, happen to fail of his wit, as there are many
 
 per ludida
 
 intervalla, that their lands and tenements shall be safely kept without waste and destruction, and that they and their household shall live and be maintained competently with the profits of the same, and the residue besides their sustentation shall be kept to their use, to be delivered to them when they come to right mind, so that such lands and tenements shall in no wise be aliened within the time aforesaid, and the King shall take nothing to his own use, and if the party die in such estate, then the residue shall be distributed for his soul by the ordinary.” In the case of the idiot, the King was thus authorized to take
 
 the
 
 profits to his own use, and was charged with the duty of finding the idiot with necessaries, and preserving the lands without waste or destruction for his heirs. The King was therefore said to have an interest, accompanied with a trust, in the estate of an idiot. But in the case of a lunatic, he was a mere trustee, to receive the profits and apply them to the competent maintenance of the lunatic and his household, to keep the lands without waste or destruction to be rendered to the lunatic on his restoration to reason, or to his heirs on his death, and to account to the lunatic on such restoration, or with the ordinary after his death, for the residue of the profits, not applied to the necessities of the lunatic and his family. In neither of these cases was it practicable for
 
 *299
 
 the King in person to exercise the prerogative, or perform the duties appertaining to the charge of lunatics and idiots, and therefore it became necessary to appoint bailiffs or committees to act for him. And in order to save the necessity of repeated applications to the Crown for the appointment of such bailiffs, as well as to ensure the faithful performance of duty in those who might be appointed, and to provide for the prudent and conscientious management from time to time of the estates of idiots and lunatics, it became the practice of the King to delegate all his authority in these mat-* ters, by a warrant under his sign manual, to the Lord Chancellor on his coming into office; by virtue whereof the Chancellor had the complete superintendence, ordering and disposition both of their property and persons. No mention indeed was distinctly made in the statutes referred to of any other property but lauds and tenements, but, in the construction of them, it was held beyond doubt that the custody of the committee and the administration of the Chancellor extended to all the estate, of every description, belonging to the
 
 non compos.
 
 With respect to personal chattels, as they were deemed ol a perishable nature, the power of disposition and administration in the committee, under the control and direction of the Chancellor, were of the most extensive kind. But under no circumstances did the Chancellor deem himself authorized to order or sanction a sale of the lands, or even a lease thereof, except during the life or incapacity of the person under his charge.
 
 Ex-parte
 
 Dikes, 8 Ves. 79. Such an act was considered forbidden by the express enactment, “so that such lands and tenements shall not be aliened.” But by the statute, 48, Geo. 3d. (which was passed long since our revolution,) and by subsequent statutes, the largest powers are granted to the Chancellor to permit the land of a lunatic to be sold, let, mortgaged, charged or incumbered, for the purpose of paying the debts or meeting 'the engagements of the lunatic,- or defraying the costs of the commission of lunacy, and the proceedings under it.
 

 In this country we meet with no special legislation on the subjects of idiotcy and lunacy before the revolution. Up to
 
 *300
 
 that time the law with us was the same with the then law of and was here administered by, or under the supervision of. the Governor and Council, w;ho .exercised the powers °f a Court of Chancery within the province. Almost immediately after the Revolution legislation began with us. By the act of 1784, c. 228, the County Courts were authorized to appoint guardians to idiots and lunatics, who were to give bonds for the faithful discharge of their duties, and to have the same poweis, and be subject to the same rules and restrictions as guardians appointed to orphans. In each case under this act, the appointment of guardian became one of pure trust. By the act of 1801, ch. 589, the County Courts were authorized, when the personal estate of the idiot or lunatic was exhausted or insufficient for his support, to make orders for the sale or the renting of his real estate. By the act of 1817, ch. 948, the Superior Courts were authorized, upon the petition of the guardian of a lunatic or an idiot, to order the sale of any part of the personal or real estate, if necessary for his or her maintenance or the discharge of debts unavoidably incurred for his or her maintenance. And finally, by the Revised Statutes, ch. 57, s. 3, as a substitute for and in lieu of the act last mentioned, it was enacted “that whenever it shall appear to the satisfaction of the Court of Equity, upon the petition of the guardian of an idiot or lunatic, that a sale of any part of the real or personal estate of such idiot or lunatic is necessary for his or her maintenance, or for debts unavoidably incurred for his or her maintenance; or whenever the court shall be satisfied that the interest of the idiot or lunatic would be materially promoted by the sale of any part of the estate, real or personal, of such idiot or lunatic, it shall be lawful for such court to decree a sale thereof, to be made by such person, in such way and on such terms as the court in its wisdom shall direct.” And, furthermore, it is by this statute among other things provided “ that the proceeds of the sale shall be exclusively applied and secured to such purposes and on such trusts as the court, when it ratifies th.e sale, shall specify and direct,”
 

 The decree of the court, ordering a sale of all the estate
 
 *301
 
 of the lunatic, does not set forth the grounds on which it proceeds. But it cannot well be doubted, but that, in ing that order upon the petition of the guardian, the court acted within the limits of its jurisdiction, and, therefore, this exercise of its authority must be respected. By this decree the court directed all the estate of the lunatic to be sold, and charged itself with the disposition of the funds to arise from such sales. Now this, its decree, will be thwarted, and this office, which it has undertaken, cannot be executed, if individuals are allowed, by a resort to legal process against the lunatic, to seize, purchase and hold the property, beyond the control of the court. The court must protect the property against all attempts to render futile its decrees. The objection made by the defendant, that he was not a party to the decree, cannot avail. If it could, an order oí sale made upon‘the petition of the guardian, might, at anytime, even after sale made, be disregarded by a creditor, for no creditor is, in form, a party to the petition. Such a decree is substantially a decree
 
 in
 
 rem, having for its object the conversion of the property into a fund, more available for all having claims against the property, and placing such fund under the control of a court, which can examine and adjust all those claims according to right. After such a decree, as after a decree
 
 quod computet
 
 rendered against an executor or administrator on a creditor’s bill filed on behalf of himself and all other creditors, the court will enjoin all creditors from interfering with the property taken into its hands, except under its direction and with its sanction. Upon the merits of the case we think the injunction was rightfully awarded, and that the motion to dissolve the injunction was rightfully refused.
 

 The case does not present the question, which has been attempted to be raised, whether the decree of sale would affect any pre-existing lien upon the property, for the
 
 teste of thejfi. fa.
 
 and the judgment itself, under which the land was sold, were both posterior to the making of the decree. But there are some other objections, rather of a technical kind, which have been urged against the correctness of the pro
 
 *302
 
 ceedings upon this bill, and which it is proper to notice.— jL1 tjje gj.gj. p]ac6} j(; js objected that the bill, in its original form, was an injunction bill; that an important amendment vvas a^owed t0 be made in it after it was filed and sworn to, and that this course was irregular. Now we are not called on to say, what would be the effect of an amendment made in a bill after an injunction issued, but we cannot see how or why any previous amendment of a bill can affect an injunction which is ordered to issue upon the
 
 bill as amended,
 
 and after it has been amended and re-sworn to. Such was the case here. It was further objected that this bill was improperly brought by the guardian of the lunatic. We have had occasion to consider and overrule a similar objection in the case of
 
 Shaw v
 
 Burney, 1 Ired. Eq. Rep. 148. In the present case there is the less ground for the objection, because here the injunction might rightfully have been awarded upon affidavit, in the case of the petition, without a bill. And lastly it is insisted, that however the court might have properly enjoined the judgment creditor from suing out or enforcing his execution against the property of the lunatic, yet after this execution had been sued out and a sale made under it without objection, there was no equity in depriving a
 
 bona fide
 
 purchaser of the title, which he had acquired in the property. It is admitted that, in most cases where Courts of Equity would, on a proper application, enjoin creditors from suing out executions, they will not, after execution executed, disturb purchasers in the enjoyment of
 
 property
 
 bought under them. These are cases where the ground for an injuction is, because of an equity against the creditor personally, so that it becomes unconscientious in him to collect the judgment, and where the collection of the judgment is the mischief to be prevented. But the ground of interference here is not because of an equity confined to the creditor. His judgment may be, and for the present is presumed to be, tor an honest debt, which may be collected without violence to conscience. The evil to be prevented is, not the collection of that debt, but a disposition of the lunatic’s property, which may defeat the arrangements made for the disposition of it by the. Court of Equity. All attempts to de
 
 *303
 
 feat these arrangements by the abuse of any legal advantages will be restrained. The court, for the maintenance its jurisdiction over the property, will enjoin all persons from diverting it from the course of administration, which it may prescribe. It cannot be pretended that there is any equity on the part of the defendant, which should render him or his case an exception from the general rule. He was perfectly aware of the decree for a sale upon the petition, before he bought under the execution. Nay it was at his instance the sale made under the decree was set aside and a new one ordered. He cannot complain that the court will not suffer him to disappoint that order. If he has paid off the judgment creditor, he can subrogate himself to the rights of the creditor, and in that character apply to the court for • satisfaction out of the fund, which it has ordered to be created. Upon that application, no doubt whatever is just will be done.
 

 This opinion will be certified to the court below, with instructions that the motion to dissolve the injunction was properly refused, and the defendant must pay the costs of the appeal.
 

 Per Curiam. Ordered accordingly.